[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 353 
This appeal involves an action arising out of reciprocal non-competition agreements entered into by Royce Kershaw, Jr. (hereinafter "Royce, Jr."), and Knox Kershaw (hereinafter "Knox"). The parties agreed to the covenants upon separating ownership of two companies, Kershaw Manufacturing Company, Inc. (hereinafter "KM Co."), and Knox Kershaw, Inc., (hereinafter "KK, Inc."). The defendants, Royce Kershaw, Jr., individually, and his company, KM Co., appeal the lower court's order validating the covenants not to compete and enjoining KM Co. and Royce, Jr., from leasing railroad maintenance equipment anywhere in the United States or Canada where KK, Inc., has done business since September 1, 1983.
The following issues are raised on appeal:
1. Whether the lower court erred in finding that KM Co. was not in the business of leasing railroad equipment prior to September 1, 1983.
2. Whether the lower court erred in validating the non-competition covenant in light of Ala. Code 1975, §8-1-1.
a. Whether this argument was properly raised by the defendants at the trial level.
b. Whether the covenant was exempt from § 8-1-1, because it involved the sale of the good will of the business.
3. Whether the covenant not to compete violated Ala. Code 1975, § 8-10-3, and Section 1 of the Sherman Antitrust Act,15 U.S.C.A. § 1, et seq. (1973).
4. Whether the non-competition agreement met the requirements of Ala. Code 1975, § 8-1-1.
a. Whether KK, Inc., had a protectable interest.
b. Whether the covenant was ambiguous and overbroad because it prohibited Royce, Jr., from leasing in any county or province where KK, Inc., "shall do business."
5. Whether the lower court erred by enjoining KM Co. from leasing anywhere in *Page 354 
the United States or Canada where KK, Inc., had done, or will do business, between September 1, 1983, and September 1, 1988.
We find no error as to the first two issues. Since the third argument was not raised at the trial level, we will not address it on appeal. On the fourth issue, we affirm the lower court's order validating the covenant. However, we modify that part of the circuit court's judgment pertaining to the validity of the territorial language in the covenant and we enforce the contract only to the extent that it prohibits Royce, Jr., and KM Co. from leasing anywhere in the United States or Canada where KK, Inc., did business prior to September 1, 1983. Finally, we modify the territorial restriction in the circuit court's order for the same reason, but affirm the order's five-year requirement.
Royce, Jr., and Knox Kershaw are brothers. The two companies involved in this suit were originally formed by Royce Kershaw, Sr. After the death of their father in 1971, and until September 1, 1983, the brothers jointly owned both KM Co. and KK, Inc.[1] Formed in 1944, KM Co. has been primarily in the business of manufacturing and selling machines used by railroads for maintaining the property surrounding the tracks. The company manufactures approximately 30 types of railroad equipment, some of which are multi-million dollar machines sold directly to railroads. On the other hand, KK, Inc., primarily is in the business of contracting maintenance services to railroads. The company provides the machinery and operators necessary to perform maintenance services and generally does not sell or lease its machines without also providing the operators to perform the job. Though the two businesses involve the same type of machinery, KM Co. is a manufacturer and seller, while KK, Inc., provides a service.
Differences of opinion about operating and directing the two companies, as well as personal conflicts, caused the parties to separate ownership. After years of negotiations, ownership of the companies was divided through two stock redemption agreements entered into on September 1, 1983. In one agreement Knox transferred his stock in KM Co. back to KM Co., in consideration of $12,817,100.00. In the other agreement Royce, Jr., transferred his stock in KK, Inc., back to KK, Inc., for a $1,500,000.00 promissory note. Knox took over sole ownership and control of KK, Inc., and Royce, Jr., obtained sole ownership of KM Co.
The stock redemption agreements also included two separate non-competition convenants. The issues on appeal involve only the validity of Royce, Jr.'s agreement not to compete with Knox and KK, Inc. The covenant reads in pertinent part:
 [F]or a period of five (5) years after the date hereof, Royce Kershaw will not, within any county or province in the United States and Canada in which [KK, Inc.] or any company affiliated with [KK, Inc.] shall do business at any time during said five (5) year period, engage in any business which is competitive with that of [KK, Inc.] as an owner, stockholder, partner or employee, nor will he in any other way compete, directly or indirectly, with [KK, Inc.] or make his services or financial resources available to any other persons. . . . Without limiting the generality of the foregoing, Royce Kershaw will not permit KM Co. to sell its undercutter machine, its shoulder cleaner, its yard cleaner or its switch undercutter to any contracting firm for use in competition with [KK, Inc.] in the United States or Canada but KM Co. may sell such machines to railroads and may sell to other customers who use the machines to perform work at their own facility. If Royce Kershaw violates the restrictions in this paragraph, the period during which this paragraph shall apply shall be extended one (1) day for each day in which a violation of this paragraph occurs, and if suit is brought to enforce this paragraph and [KK, Inc.] establishes one or more violations by Royce Kershaw, [KK, Inc.] shall be entitled to an *Page 355 
injunction restraining Royce Kershaw for further violations for a period of two (2) years from the date of the final decree less only such number of days that Royce Kershaw has not violated this Agreement, the burden on the employee [sic] to establish the number of days in which violations have not occurred.
(Emphasis added.)
On March 1, 1985, KK, Inc., filed a complaint, which was later amended, seeking a declaratory judgment and an injunction enjoining and restraining Royce, Jr., and KM Co. fromleasing railroad maintenance equipment in alleged violation of the covenant not to compete. The defendants filed an answer and an amended answer with general denials asserting that the covenant was unenforceable because KK, Inc., lacked the necessary protectable interest to restrain Royce, Jr., or KM Co. from engaging in any business other than contract services for railroads in cities or counties where KK, Inc., was engaged in business prior to September 1, 1983.
After a trial without a jury, the lower court held in favor of the plaintiffs on the grounds that the covenant not to compete was valid, and that the defendants had violated the agreement by attempting to enter into lease agreements. The lower court entered an order enjoining the defendants from:
 [O]ffering for straight leasing, undercutters, shoulder cleaners, yard cleaners and switch undercutters for that period and under the geographic restrictions as set forth in the non-competition agreement executed by Royce Kershaw, Jr. on September 1, 1983 and for any extensions of time that may be granted in subsequent Orders of the Court.
Upon a motion by the defendants to have the court clarify the order, the lower court issued its "Order on Rehearing" and deleted Provision VI of the prior order, replacing it with the following:
 The prayer for relief of Knox Kershaw, II, and [KK, Inc.] in which injunctive relief is requested is due to be granted and by this Order, Royce Kershaw, Jr., and KM Co. are hereby restrained from offering for straight leasing, undercutters, shoulder cleaners, yard cleaners and switch undercutters for a period of five years from September 1, 1983, and for such additional period as may be granted in any subsequent Order of this Court, in any county or province in the United States or Canada in which [KK, Inc.] has done business since September 1, 1983.
The defendants appeal the lower court's order enjoining KM Co. from leasing the specified equipment for a period of five years, anywhere in the United States or Canada where KK, Inc., has done business since September 1, 1983.
 I.
The defendants first argue that the intent of the covenant was to allow the parties to continue the business each maintained prior to the agreement, but not to prohibit future competition in new areas. Therefore, they say, KM Co. should not be enjoined from continuing its normal business of manufacturing, selling, and leasing undercutters, shoulder cleaners, yard cleaners, and switch undercutters. The primary issue is whether the defendants were engaged in leasing this equipment prior to September 1, 1983. In order to prove that KM Co. had been leasing equipment since 1953, the defendants presented various sales brochures from 1953 and 1956, which stated that KM Co. was prepared to "sell or lease" its equipment. Furthermore, the defendant introduced exhibits derived from reconstructing the sales records of KM Co., indicating that the defendant had entered into 17 lease agreements since 1953.
At trial, however, various defense witnesses admitted that they could not recall any specific instances in which KM Co. had actually leased any of the specified equipment since 1966. Further, on cross-examination, the defense witnesses admitted that in some of the cases where they alleged there had been a lease, there was actually a "sale," but that it was labeled a "lease" for tax purposes. There was also evidence to support the plaintiffs' contention that as of September 1, 1983, the defendants had *Page 356 
none of the four machines for rent; that after 1973 the defendants' financial statements did not include a rental income category; and finally, that the small revenues from rental income reflected in the defendants' prior financial statements showed that it did not receive rental income for the particular machines listed in the non-competition covenant.
The circuit court found as a matter of fact that KM Co. was not in the business of leasing equipment to railroads prior to September 1, 1983. Though there was some evidence of leasing by KM Co. prior to 1983, the credibility of the evidence was questionable. This Court cannot overturn that finding of fact by the lower court unless the decision is unsupported by the evidence, see Dickey v. McClammy,452 So.2d 1315 (Ala. 1984), and is plainly and palpably erroneous. Waste Disposal, Inc. v. Stewart,432 So.2d 1255 (Ala. 1983); Kwick Set Components, Inc. v. DavidsonIndustries, Inc., 411 So.2d 134 (Ala. 1982). Further, the presumption of correctness exists even though there may be conflicting evidence. See May v. Campbell,470 So.2d 1188 (Ala. 1985); Alabama Farm Bureau Mut. Cas. Ins. Co. v.Moore, 435 So.2d 712 (Ala. 1983). Because reasonable minds could differ as to whether KM Co. was in the business of leasing prior to September 1, 1983, the lower court finding is presumed to be a reasonable inference drawn from the evidence.Dennis v. Dobbs, 474 So.2d 77 (Ala. 1985); Popwellv. Greene, 465 So.2d 384 (Ala. 1985). We, therefore, uphold the lower court's judgment on this issue.
 II.
The defendants' next ground for reversal is that the lower court erred in validating the non-competition covenant in the stock redemption agreement between Knox and KK, Inc., and Royce, Jr., because, they say, the covenant was void under Ala. Code 1975, § 8-1-1.[2] Section 8-1-1, prohibits restraint of trade or restraint in the lawful operation of a business unless the covenant involves the sale of the good will of a business or the covenant constitutes only a partial restraint.
The plaintiffs argue that the question of the invalidity of the covenant not to compete under § 8-1-1 was not raised at trial and, therefore, cannot be raised as a new theory on appeal. See Kent v. Sims, 460 So.2d 144 (Ala. 1984);Vaughn v. Thomas, 372 So.2d 1309 (Ala. 1979);Bailey v. City of Mobile, 292 Ala. 436, 296 So.2d 149
(1974); Union Springs Tel. Co. v. Green, 285 Ala. 114,229 So.2d 503 (1969); Talley v. A M ConstructionCo., 284 Ala. 371, 225 So.2d 359 (1969), cert.denied, 397 U.S. 955, 90 S.Ct. 1133, 25 L.Ed.2d 402
(1970). While that principle is true, we find that the defendants raised the question of the invalidity of the covenant not to compete at the trial level. The arguments made by the defendants were in the alternative — that the covenants were invalid, but, if the court found them to be valid, then that the plaintiffs (counter-defendants) had violated the covenant. Therefore, the arguments were properly raised on appeal.
The defendants, KM Co. and Royce, Jr., claim that Ala. Code 1975, § 8-1-1, voids Royce, Jr.'s covenant not to compete with Knox and KK, Inc. Section 8-1-1 voids "every contract by which anyone is restrained from exercising a lawful . . . trade or business of any kind otherwise than is provided by this section." The defendants reason that because the covenant not to compete prohibits KM Co. from engaging in any business that directly or indirectly competes with that of KK, Inc., *Page 357 
the covenant is void as a restraint of a trade or business. However, even if this Court assumes that the statute applies to the covenant not to compete, the covenant is not void because it falls within the statutory exception in § 8-1-1(b), which states:
 One who sells the good will of a business may agree with the buyer . . . to refrain from carrying on or engaging in a similar business and from soliciting old customers of such employer within a specified county, city or part thereof so long as the buyer, or any person deriving title to the good will from him . . . carries on a like business therein.
There are four essential elements to this statutory exception: 1) a "sale," 2) a sale of good will, 3) a covenant that is restricted as to territory; and, 4) carrying on a like business.
The defendants argue that there was no sale involved in this transaction, and, therefore, that § 8-1-1 does not apply. We disagree. This Court has previously decided that the transfer or exchange of stock in a merger constitutes a "sale" and, specifically, a sale of good will within the meaning of § 8-1-1. First Alabama Bancshares, Inc. v.McGahey, 355 So.2d 681 (Ala. 1977); Central Bank ofthe South v. Beasley, 439 So.2d 70 (Ala. 1983). The rule set forth in McGahey, supra, is applicable to the instant case. The Kershaw brothers could have divided ownership of KK, Inc., and KM Co. in two separate transactions whereby the stock was sold and then purchased by the other brother. In that situation there clearly would have been a "sale" within the meaning of § 8-1-1. The fact that there was a single transaction in which the brothers exchanged (rather than sold and bought) the shares to divide ownership of the companies does not take this out of the context of a "sale" within the meaning of § 8-1-1. We, therefore, conclude that the exchange of stock constituted a sale.
The defendants next argue that even if there was a sale, it did not constitute a sale of good will within the meaning of the statute. First, good will was neither listed as an asset nor specified in the contract. Furthermore, the primary elements of good will, including continuity of name and place, were not present in the transaction because the name of the plaintiffs' company changed from Royce Kershaw Co., Inc., to Knox Kershaw, Incorporated, and because KK, Inc., changed locations within the City of Montgomery. See Yost v.Patrick, 245 Ala. 275, 17 So.2d 240 (1944). The Court inYost, supra, stated:
 It is said: "The chief elements of value in good will are continuity of place and continuity of name." 24 Am.Jur. 805.
 Again: "All definitions of good will incorporate as one of the chief elements thereof the advantage accruing to a vendee from the old business stand * * *.
 "As exemplified in the definitions, another of the elements of good will is the name with which patrons of a business associate their past satisfaction and upon which they found their anticipation of future satisfaction. The name may be of the place of business, the name under which the business is conducted, or the brand or trade name of the article produced. * * *" 24 Am. Jr. 806; Collas v. Brown, 211 Ala. 443, 100 So. 769.
Yost, 245 Ala. at 281, 17 So.2d at 245. Finally, the defendants argue that because KK, Inc., was a satellite company of KM Co., with the same sales representatives and customers, it would be impossible to divide the good will of the two companies.
In deciding whether an individual shareholder could sell the good will of the business through his shares of stock, theMcGahey Court set forth the standard for determining what constitutes a sale of good will pursuant to § 8-1-1:
 [It is a] well-settled rule in Alabama that the stockholders of a corporation are the equitable owners of its assets. Williams v. North Ala. Express, 263 Ala. 581, 83 So.2d 330 (1955). Therefore, because the good will of a corporation is a corporate asset, a stockholder is the equitable owner of that good will in the proportion that his shares bear to the total outstanding shares of stock in the corporation. Or, as specifically held in Wylie v. Wylie Permanent Camping Co., 57 Mont. 115, *Page 358 187 P. 279 (1920), "Good will is not a thing apart, but an incident to and inherent in the thing itself — the business."
 The view we have taken is followed by other states which have considered this question. In Bessel v. Bethke, 56 N.D. 1, 215 N.W. 868, 869 (1929), it was stated:
 "Where one sells his stock he necessarily disposes of his interest in the good will of the business conducted by the corporation to the same extent as he parts with his interest in any other property of the corporation."
 See also Public Opinion Publishing Co. v. Ransom, 34 S.D. 381, 148 N.W. 838 (1913); Buckhout v. Witwer, 157 Mich. 406, 122 N.W. 184 (1909); and 54 Am. Jur.2d, Monopolies, § 526.
 In Key v. Perkins, 173 Okla. 99, 46 P.2d 530, 532 (1935), statutes and facts were similar to the instant case. After examining the above-noted cases, as well as the California rule, the Court stated:
 "As we view it, the weight of authority and sound reasoning and logic support the contention that the owner of an appreciable interest in the stock and property and assets of a corporation has a proportionate interest in the good will of the business; and that on a sale thereof such owner is bound by a contemporaneous agreement, supported by an adequate consideration not to engage in a similar business within the territorial and time limits. . . ."
 Therefore, we conclude that an individual stockholder may sell the good will of a corporation in proportion to his interest in that corporation.
McGahey, 355 So.2d at 683.
The rule set forth in McGahey, applies to the instant case. Good will is not a tangible item that can be isolated. Although "good will" was not specified as an asset in the sale, it was "incident to and inherent in" the business itself, and was, therefore, included in the exchange of stock.Wylie, supra; Yost, 245 Ala. at 280,17 So.2d at 245.
Second, the elements of good will set forth in Yost, supra, are not directly applicable to the instant case. Although it is true that continuity of time and place are elements of good will, these elements must be considered in the context of the situation. If this had been a local grocery store that changed its name and moved across town after it was sold, then the change in name and location would be relevant, because the business and customer base would have been small to begin with. That is not the situation with the Kershaw businesses. Because of the large and international nature of the manufacturing and contract service businesses, the change from "Royce Kershaw, Co." to "Knox Kershaw, Inc." had little impact. Moreover, the significance of the company name is in "Kershaw," the last name of the man who founded the company. Finally, a change in location from one street to another in the same city would have had absolutely no effect on the international customers and sales representatives dealing with the company. For these reasons, we conclude that a continuity in name and location was not a necessary aspect of the "good will" involved in this sale.
The defendants, finally, argue that it is impossible to divide the good will of the two businesses because they were once part of the same company. We disagree. Each company had its own stock, as evidenced by the "exchange" of stock to divide ownership of the two companies. Furthermore, this Court held in McGahey, supra, that shareholders may sell the good will of a business in proportion to the amount of stock the shareholder has in the corporation. Although it may be true that the companies shared the same customers and sales representatives to some extent, the manufacturing and contract service businesses were separate and distinct companies; therefore, each company maintained its own good will.
Having concluded that the exchange of stock between the Kershaw brothers constituted a sale of good will, the only remaining question is whether the covenant not to compete is invalid because it is overly restrictive. *Page 359 
KM Co. and Royce, Jr., assert that the covenant is ambiguous and overbroad since it prevents Royce, Jr., from leasing the specified equipment "within any county or province within the United States and Canada in which [KK, Inc.] . . . shalldo business at any time during said five (5) year period." (Emphasis added.)[3] The defendants reason that KM Co. has no way of knowing where KK, Inc., might do business in the future. On the other hand, the plaintiffs argue that, in practice, this provision is not unreasonable, because KK, Inc., does business with every railroad in the United States and Canada. In spite of the plaintiffs' argument, we find the provision to be overly broad and ambiguous, because it would also prohibit the defendants from doing business with anynew railroad company within the United States and Canada. Furthermore, by its terms, the provision prohibits trade in unidentifiable areas and subjects KM Co. to the future decisions of KK, Inc.
Nevertheless, this overbreadth and vagueness does not invalidate the entire covenant. This Court has previously held that when an agreement in restraint of trade contains unreasonable limitations, the court may strike the unreasonable restriction from the agreement, or the court can enforce the contract within its reasonable limits. See CullmanBroadcasting Co. v. Bosley, 373 So.2d 830 (Ala. 1979);Daughtry v. Capital Gas Co., 285 Ala. 89,229 So.2d 480 (1969); and Clooney v. WCPO Television Division ofScripps-Howard Broadcasting Co., 35 Ohio App.2d 124,300 N.E.2d 256 (1973). We hold that the covenant not to compete is enforceable only to the extent that it prohibits KM Co. from leasing the specified equipment in any place in the United States or Canada where KK, Inc., did business prior to or on September 1, 1983.
 III.
The defendants next assert that the covenant not to compete violates Ala. Code 1975, § 8-10-3, and § 1 of the Sherman Antitrust Act, 15 U.S.C.A. § 1 (1973). The plaintiffs again raise the argument that this is a new issue raised for the first time in the post-trial motion and is not properly the subject for appeal. We agree with the plaintiffs. The defendants failed to plead illegality as an affirmative defense in their answer or amended answers, and the issue was not raised at the trial level until the post-trial motions. Rule 8(c), Ala.R.Civ.P., states:
 (c) Affirmative Defenses. In pleading to a preceding pleading, a party shall set forth affirmatively . . . illegality . . . and any other matter constituting an avoidance or affirmative defense.
Because the defendants failed to raise illegality as an affirmative defense prior to the post-judgment motion, that defense is waived. Bechtel v. Crown Central PetroleumCorp., 451 So.2d 793 (Ala. 1984); see also, Baker v.Ball, 446 So.2d 39 (Ala. 1984); Hughes v.Wallace, 429 So.2d 981 (Ala. 1983). The defendant cannot try the case on one theory and then appeal on a different theory. See Kent, supra; Vaughn, supra;Bailey, supra; Greene, supra; and,Talley, supra. There is no record for review of this issue by this Court and, thus, we will not address the validity of the covenants under state and federal antitrust laws.
 IV.
The defendants next argue that in order for the noncompetition covenant to be valid, the purchaser must have a substantial right which is a protectable interest. SeeJames S. Kemper Co., Southeast, Inc. v. Cox Associates,Inc., 434 So.2d 1380 (Ala. 1983); Robinson v. ComputerServicenters, Inc., 346 So.2d 940 (Ala. 1977); MasonCorp. v. Kennedy, 286 Ala. 639, 244 So.2d 585 (1971); andDobbins v. Getz Exterminators of Alabama, Inc.,382 So.2d 1135 (Ala.Civ.App. 1980). The lower court found as a matter of fact that KM Co. was not in the business of straight leasing prior to September 1, 1983. *Page 360 
The court also found that KK, Inc., was in the business of contracting railroad maintenance services prior to September 1, 1983, but made no specific finding as to whether KK, Inc., was in the business of straight leasing prior to that date. Because KK, Inc., was not in the business of straight leasing, the defendants argue that KK, Inc., has no protectable interest entitling it to restrain KM Co., from engaging in the straight leasing business. We disagree.
The agreement was not a covenant not to "lease"; rather, it was a covenant not to engage in any business which was either directly or indirectly competitive with the business conducted by KK., Inc. Leasing and contract services are distinguishable. However, every time KM Co. leases equipment to a railroad so that it can perform maintenance services itself, it proportionately decreases the railroad's need to hire KK, Inc., to perform the maintenance services. Although this is certainly indirect competition, indirect competition is precisely what the covenant prohibits KM Co. from doing.
Aside from its protectable interest in straight leasing, this Court has previously decided that upon acquiring the good will of a business in a sale, the good will is also a protectable interest. See Beasley, supra, and McGahey, supra. Because we have held that the exchange of stock involved the sale of the good will of the business, it follows that KK, Inc., also has a protectable interest in the good will of the business.
Having concluded that KK, Inc., has a protectable interest in both straight leasing and the good will of the business, we affirm the lower court's judgment upholding the covenant not to compete.
 V.
The defendants' final argument is that the injunction issued by the lower court should not be upheld for two reasons. First, the order states that KM Co. cannot lease equipment "in any county or province in the United States or Canada in which [KK, Inc.], has done business since September 1, 1983." (Emphasis added.) For the same reasons noted in Section II, we modify the lower court's order to read "in any county or province in the United States or Canada in which [KK, Inc.]did business prior to September 1, 1983."
The defendants' second reason for requesting that the injunction be invalidated is that it restrains KM Co. for a period of five years from September 1, 1983, even though the terms of the covenant state that upon the finding of a violation of the agreement KK, Inc., "shall be entitled to an injunction . . . for a period of two (2) years from the date of the final decree." The defendants assert that this should be interpreted to mean that Royce, Jr., and KM Co. should be enjoined only for two years from October 10, 1985 — the date of the lower court's judgment.
We disagree with the defendants' interpretation of the covenant, and we uphold the circuit court's judgment. Clearly, the covenant was meant to be enforceable for a period of five years. The "two year" clause was a penalty in addition
to the five years, in the event that KM Co. violated the covenant. To construe the clause otherwise would permit KM Co. to be advantaged by violating the covenant as soon as possible so that the two years would begin to run, perhaps before the end of the five years specified in the covenant. Such a reading of the agreement is not reasonable.
For the foregoing reasons, the judgment of the circuit court is affirmed as modified.
AFFIRMED AS MODIFIED.
TORBERT, C.J., and JONES, BEATTY and HOUSTON, JJ., concur.
MADDOX and ALMON, JJ., concur in part, and dissent in part.
SHORES and STEAGALL, JJ., dissent.
[1] The companies have been known by a variety of names over the years, but for the sake of simplicity, we will refer only to their current names.
[2] In the defendants' counterclaim against Knox and KK, Inc., the defendants relied on the validity of Knox's covenant not to compete with Royce, Jr., to prove that KK, Inc., and Knox had violated that covenant by trying to lease equipment to Burlington-Northern Railroad. The circuit court noted that the defendants were trying to find one of the reciprocal covenants textually invalid and the other valid; thus, the court presumed that the parties actually intended to argue for the validity of both covenants not to compete. The Court held:
 For the purposes of this Order, and in the absence of positions of the parties to the contrary, the court will recognize both the validity and enforceability of both of the non-competition covenants in the respective stock redemption agreements.
[3] The defendants did not argue that the covenant was void because it was not restricted to a "specified county, city or part thereof"; therefore, we will not address that question on appeal.